UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ISRAEL ARCE, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 102 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, TIMOTHY | ) | |
| CARDUFF, and DANIEL MURPHY, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

In December 2012, Israel Arce retired—involuntarily, he claims—from the Chicago

Transit Authority ("CTA"), where he had worked since 1998 as a service truck driver. In

January 2014, he sued CTA and two supervisors, Daniel Murphy and Timothy Carduff, for a

variety of alleged wrongs. Doc. 1. Arce filed an amended complaint in February 2014, Doc. 8;

Defendants moved to dismiss the amended complaint, Doc. 21, and Arce elected to file a second

amended complaint rather than litigate to completion the motion to dismiss, Doc. 44. The

second amended complaint alleges that Defendants discriminated against Arce based on his race

and national origin (he is Puerto Rican), created a hostile work environment, and forced him to

retire because of back injuries he suffered on the job, in violation of 42 U.S.C. § 1981, Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*., the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 *et seq*., and the Fifth and Fourteenth Amendments to the United

States Constitution. Doc. 44. The second amended complaint also alleges that CTA

intentionally and negligently inflicted emotional distress. *Ibid*. Defendants have moved under

Federal Rule of Civil Procedure 12(b)(6) to dismiss the suit. Doc. 54. The motion is granted in

part and denied in part.

**Background**

On a motion to dismiss under Rule 12(b)(6), the court must accept the operative complaint's well-pleaded factual allegations, with all reasonable inferences drawn in Arce's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014); *Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Arce's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). The facts are set forth as favorably to Arce as those materials permit. *See Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 682 (7th Cir. 2014); *Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

Arce joined CTA in January 1998 as a truck driver, reporting to Murphy. Doc. 44 at pp. 2-3, ¶¶ 8, 21. Arce had previously worked for the Chicago Public School system, and while there had received workers' compensation benefits for an injury. *Id.* at p. 5, ¶ 32. Upon learning this fact, Carduff (at the time not a manager) told other drivers that Arce was "a useless Puerto Rican, a Puerto Rican scammer, and a workman's compensation train wreck." *Ibid.* Carduff also pretended Arce's first name was "Egypt." *Ibid.* Carduff and Murphy are white. *Id.* at pp. 2-3, ¶¶ 13, 15. Sometime in 1998, Arce hurt his back on the job; but when he returned to work in September of that year, Murphy refused to assign him to drive a truck, instead making him change truck tires and pick up wheels without assistance. *Id.* at p. 5-6, ¶ 33. Yet when at

least four white employees returned from similar injuries, they were each given "light duty" or even no assignments. *Id*. at p. 6, ¶ 34.

Arce hurt his back again at some point; in 2005, while recovering, he was assigned to a truck that allowed noxious fumes from the exhaust to enter the truck cabin, causing him to suffer a headache and nausea. *Id.* at p. 12, ¶ 64. In June 2007, Arce again hurt his lower back on the job. *Id*. at p. 3, ¶¶ 22-23. Carduff, by then Arce's direct supervisor, *id*. at p. 2, ¶ 12, and Murphy had assigned Arce to drive a "front loader" that lacked adequate suspension and "bounced vigorously," aggravating his lower back injuries. *Id*. at p. 12, ¶¶ 65-66. It is unclear from the operative complaint how much time (if any) Arce missed due to the June 2007 injury, but in January 2008 Murphy and Carduff demanded that he return to work on full duty without restrictions. *Id.* at p. 9, ¶ 51. Whether Arce returned at that time and was subsequently reinjured, or whether he never returned, is also unclear; the complaint states simply that Arce was ready to return to work in October 2009. *Id*. at p. 6, ¶ 37. Arce had requested an accommodation for his injuries, and CTA had offered to limit his work assignments to those requiring that he lift no more than 70 pounds occasionally and 35 pounds frequently. *Id*. at p. 10, ¶ 56. Murphy and Carduff, however, never told Arce about the offer, and so he returned to work without restrictions and his accommodation request was "withdrawn" without his knowledge. *Id*. at pp. 10-11, ¶¶ 57-58.

Upon returning to work in late October 2009, and pursuant to a clause in the union's collective bargaining agreement that allowed workers to select their trucks in order of seniority, Arce asked to be assigned to Truck 262, which he felt had "stable seating and [a] good suspension … that would not aggravate his previous injury." *Id*. at pp. 6-7, ¶ 37. Immediately after Arce made his selection, however, Carduff removed Truck 262 from service "for an oil

change"; the truck remained out of service for seven weeks, and Arce was forced to drive another truck. *Id.* at p. 7, ¶ 39. Carduff then "publicly bet $20.00 … that [Arce] would not last until Christmas." *Id.* at p. 11, ¶ 62. On January 7, 2010, Carduff assigned Arce to drive a truck with a broken seat and stiff suspension; Arce suffered what wound up being a "career ending injury" to his tailbone as a result. *Id.* at p. 7, ¶¶ 40, 42. Truck 262 was returned to service the next day. *Id.* at p. 7, ¶ 41.

In May 2010, a CTA doctor determined that Arce was medically capable of returning to work, and so CTA stopped paying Arce disability benefits. *Id.* at p. 8, ¶ 44. Arce wanted to return to work in November 2010, but Murphy and Carduff refused to allow him his pick of trucks at that time. *Id.* at p. 8, ¶¶ 43, 45. Arce had been assigned to "Area 605" (a designation for injured workers on disability leave, *id.* at p. 8, ¶ 47), and Murphy and Carduff believed that under the collective bargaining agreement, workers in Area 605 did not have the right to pick trucks based on seniority. *Id.* at p. 8, ¶ 45. Yet they allowed at least one white employee in Area 605 to pick his vehicle. *Id.* at p. 8, ¶ 46.

In October 2012, a CTA benefits officer told Arce that he would soon lose his benefits unless he retired and began collecting a disability pension. *Id*. at p. 16, ¶ 81; *id*. at p. 28, ¶ 34. On November 7, 2012, Larry Wall, general manager of the CTA benefits department, told Arce that if he did not return to work by January 7, 2013, he would be discharged. *Id*. at p. 16, ¶ 82. Arce requested to be put on light duty, but Wall denied that request on December 4, 2012. *Id*. at p. 16, ¶ 83. Arce then retired from CTA sometime between December 31, 2012, and January 7, 2013. *Id*. at p. 2, ¶ 9 (listing a retirement date "on or about December 31, 2012"); Doc. 44-4 at 2 (alleging that "[o]n January 7, 2013, I was forced into retirement").

Meanwhile, on December 19, 2012, Arce filed a charge with the Illinois Department of Human Rights ("IDHR") and U.S. Equal Employment Opportunity Commission ("EEOC"). *Id.* at p. 16, ¶ 84; Doc. 44-2. (For ease of exposition, the court will refer to Arce's various charges as EEOC charges, with the understanding that they were also filed with IDHR.) The charge alleged that Wall's November 7, 2012 ultimatum amounted to harassment on the basis of Arce's disability and was in retaliation for a 2009 complaint that Arce had made. Doc. 44-2 at 1-2. Wall's stated reason for the ultimatum was that Arce "ha[d] been in an inactive employment status in excess of the maximum time permitted." *Id.* at 2. The charge also alleged that Wall's December 4, 2012 refusal to assign Arce to light duty violated CTA's obligation to accommodate Arce's disability, and was done on the basis of Arce's race and national origin. *Id.* at 3-4. Wall's stated reason for denying the light duty request was that "there was no alternate position available." *Id.* at 3.

EEOC sent Arce a right-to-sue letter on June 2, 2014. Doc. 44-1. In the meantime, Arce filed two more EEOC charges; the first, dated March 27, 2013, alleged that he was forced into retirement on January 7, 2013, on the basis of his race, national origin, and disability. Doc. 44-4. CTA's stated reason for forcing him to retire, according to Arce, was his "inability to return to work in full duty status because [he] was a threat because of the medication [he] took." *Id.* at 2. Arce received a right-to-sue letter for that charge on June 17, 2014. Doc. 44-3. The other charge, filed on July 3, 2013, alleged that Arce was forced into retirement on the basis of his age (64 at the time). Doc. 44-6. Although Arce received a right-to-sue letter on this charge on June 5, 2014, Doc. 44-5, he does not allege age discrimination in the operative complaint, Doc. 44. Arce filed this lawsuit on January 7, 2014. Doc. 1.

**Discussion**

I.       **Title VII and ADA Claims**

Counts 2 and 3 of the second amended complaint allege that CTA created a hostile work environment on the basis of Arce's race and national origin; Counts 4, 5, and 6 allege that CTA forced Arce to retire because of his race, national origin, and disability.  Doc. 44.  Defendants argue that those claims should be dismissed as time barred or, equivalently, for failure to exhaust administrative remedies.  Doc. 55 at 5-6, 10-11.

"An individual wishing to challenge an employment practice under [Title VII] must first file a charge with the EEOC.  Such a charge must be filed within a specified period (either 180 or 300 days, depending on the State) after the alleged unlawful employment practice occurred, and if the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court."  *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 623-24 (2007) (internal quotation marks and citations omitted), *superseded by statute with respect to compensation practices*, Pub. L. No. 111-2, 123 Stat. 5 (Jan. 29, 2009); *see Hill v. Potter*, 352 F.3d 1142, 1145 (7th Cir. 2003) (same); 42 U.S.C. § 2000e-5(f)(1).  "In Illinois, the charging period is 300 days."  *Groesch v. City of Springfield*, 635 F.3d 1020, 1024 n.2 (7th Cir. 2011). These requirements apply equally to discrimination claims under the ADA.  *See* 42 U.S.C. § 12117(a) (adopting Title VII's requirements); *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004) ("In Illinois, an employee may sue under the ADEA or ADA only if he files a charge of discrimination with the EEOC within 300 days of the alleged 'unlawful employment practice.'").  In short, a Title VII or ADA "plaintiff cannot bring claims in a lawsuit that were not included in h[is] EEOC charge."  *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) (internal quotation marks omitted).

6

Two of Arce's EEOC charges are pertinent to the Title VII and ADA claims. Docs. 44-2, 44-4. That Arce did not have right-to-sue letters in hand when he filed this suit is immaterial, now that he has the letters. *See Worth v. Tyer*, 276 F.3d 249, 259 (7th Cir. 2001) (holding that because a right-to-sue letter is not jurisdictional, obtaining one after filing suit suffices to defeat a motion to dismiss) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). But the allegations in his EEOC charges are limited to alleged conduct on just three dates: November 7, 2012 (Wall's telling Arce that he would be discharged if he did not return to work by January 7); December 4, 2012 (Wall's denial of Arce's request for light duty); and January 7, 2013 (the date of Arce's forced retirement). Docs. 44-2, 44-4.

"[C]laims brought in judicial proceedings must be within the scope of the charges filed with the EEOC[.]" *Conner v. Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005). Accordingly, "an aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Ibid.* (internal quotation marks and alteration omitted). Yet in alleging various instances of discriminatory conduct not included in the EEOC charges—conduct that in fact predates February 23, 2012, and is thus outside the 300-day limitations period—Arce's operative complaint attempts to do just that. That is improper. *See Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 681 (7th Cir. 2007) ("Brown is time-barred from filing suit under Title VII for any 'discrete act' about which he did not file an EEOC charge within the 300-day EEOC charging deadline.").

To be sure, "a plaintiff can still bring claims not included in the EEOC charge if they are like or reasonably related to the allegations of the EEOC charge and growing out of such allegations." *Lavalais*, 734 F.3d at 634 (internal quotation marks, alterations, and citations

omitted).  But that principle applies only to otherwise *timely* allegations; "[d]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (internal quotation marks omitted) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)); *see Morgan*, 536 U.S. at 114 ("While Morgan alleged that he suffered from numerous discriminatory and retaliatory acts from the date that he was hired through March 3, 1995, the date that he was fired, only incidents that took place within the timely filing period are actionable.").

In an effort to deal with this problem, Arce seeks leave to replead, averring that he has since amended his EEOC charge to include conduct dating back to 1998.  Doc. 61 at 8.  Labor Department regulations allow EEOC charges to be amended, but only "to cure technical defects or omissions" or to "clarify and amplify allegations made" in the original charge.  29 C.F.R. § 1601.12(b).  Adding entirely new allegations satisfies neither criterion.  *See Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 502 (7th Cir. 1994) (holding that 29 C.F.R. § 1601.12(b) does not permit a plaintiff to add conduct not reasonably related to that alleged in the original EEOC charge).  Moreover, Arce cites no authority to suggest that adding new allegations outside the 300-day window is permitted by rule or statute; indeed, Arce's position would render the 300-day limitations period meaningless.

Slightly more promising is Arce's invocation of the "continuing violation" doctrine, which he says rescues his otherwise untimely allegations.  The Supreme Court in *Morgan* acknowledged that "[h]ostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct."  536 U.S. at 115.  Therefore, said the Court, "[i]n order for the charge to be timely, the employee need only file a charge within … 300 days of *any act*

8

that is part of the hostile work environment." *Id*. at 118 (emphasis added). The problem, however, is that the allegations in Arce's EEOC charges do not plausibly suggest a hostile work environment. Instead, the charges mention only three discrete acts: the threatened termination on November 7; the light-duty assignment refusal on December 4; and the forced retirement on January 7. Even taken together, those acts are insufficient to establish a viable hostile work environment claim. The Seventh Circuit has, it its own words, "on many occasions distinguished between harassing and merely objectionable conduct":

> *See*, *e.g.*, *Hilt-Dyson* [*v. City of Chicago*], 282 F.3d [456,] 463-64 [(7th Cir. 2002)] (holding that plaintiff's allegations that supervisor rubbed her back, squeezed her shoulder and stared at her chest during a uniform inspection while telling her to raise her arms and open her blazer were isolated incidents that, even when taken together, did not create a sufficient inference of a hostile work environment); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that plaintiff's complaints of eight gender-related comments during course of her employment, including that "the only valuable thing to a woman is that she has breasts and a vagina," insufficient to demonstrate hostile work environment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (finding plaintiff's complaints of teasing, ambiguous comments about bananas, rubber bands and low-neck tops, staring and attempts to make eye contact and four isolated incidents where a co-worker briefly touched her arm, fingers or buttocks did not constitute sexual harassment).

> With these precedents in mind, we conclude that the incidents that occurred prior to Copenharve's physical assault of McPherson on March 21, 2001, although boorish, do not constitute the severe or pervasive conduct necessary to create an objectively hostile work environment in violation of Title VII. While Copenharve's inquiries about what color bra McPherson was wearing, his suggestive tone of voice when asking her whether he could "make a house call" when she called in sick and the one occasion when he pulled back her tank top with his fingers were lamentably inappropriate, we agree with the district court that, due to the limited nature and frequency of the objectionable conduct, a hostile work environment did not exist until the March 21, 2001 assault.

*McPherson v. City of Waukegan*, 379 F.3d 430, 438-39 (7th Cir. 2004) (paragraph break added).

Even construed in a light most favorable to Arce, the EEOC charges describe at worst only "objectionable" conduct. After all, his sole allegation of "harassment," the November 7

ultimatum, acknowledges that Wall's stated reason was "because [Arce] ha[d] been in an inactive employment status in excess of the maximum time permitted." Doc. 44-2 at 2. Maybe that reason was pretextual, and maybe it states a discrete violation of Title VII or the ADA, but it hardly amounts to the sort of repugnant behavior the Seventh Circuit described in *McPherson* and the cases cited therein—behavior that was held *not* to be egregious enough to make out a hostile work environment claim. *See McPherson*, 379 F.3d at 438-39. Moreover, "[a] plaintiff bringing a hostile environment claim must establish that the workplace was both subjectively and objectively offensive." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005). Given that Arce was not even working in 2012, it is hard to see how he can plausibly allege that the "*workplace* was both subjectively and objectively offensive" during that time. Absent plausible hostile work environment allegations in the EEOC charges, Arce is barred from recovery on that theory. *See Lavalais*, 734 F.3d at 635 ("Nothing in Lavalais's … EEOC charge fairly suggests a hostile work environment, so such a claim fails."); *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1035 (7th Cir. 2004) (holding that the plaintiff's hostile work environment claim was barred because "the facts and allegations set forth in Hottenroth's final two EEOC filings do not rise to the level of cognizable hostile workplace claims").

Even were the court to overlook Arce's failure to include true hostile work environment allegations in his EEOC charges, the continuing violation doctrine still would not save his hostile work environment claims. The most egregious conduct described in the operative complaint dates back to 1998, when Carduff—not even a supervisor at the time—labeled Arce a "useless Puerto Rican" and called him by the wrong first name. But under Seventh Circuit precedent, which of course binds this court, "[t]he mere utterance of a racial epithet that engenders offensive feelings does not sufficiently affect the conditions of employment to create a hostile

work environment." *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 997 (7th Cir. 2002); *see Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) ("We have stated that while there is no 'magic number of slurs' that indicates a hostile work environment, an 'unambiguously racial epithet falls on the "more severe" end of the spectrum.' However, while referring to colleagues with such disrespectful language is deplorable and has no place in the workforce, one utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability.") (citation omitted). In any event, Arce's other allegations are far too spread out in time to allow stringing them together for purposes of the continuing violation doctrine. Following Carduff's inexcusable 1998 insults, Arce alleges a 2005 assignment to a cab with noxious fumes, a 2007 assignment to drive a front loader, and a few incidents in late 2009: denying him an accommodation, taking Truck 262 out of service, and Carduff's betting $20 that Arce would not last until Christmas. Discrete incidents separated by such lengthy gaps cannot be strung together to form a single hostile work environment claim. *See Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004) (holding that a three-year gap between incidents defeats a continuing violation claim); *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708-09 (7th Cir. 2002) (holding that a one-year gap was too long in part because "if the employee knew, or with the exercise of reasonable diligence should have known, that each act, once completed, was discriminatory, the employee must sue upon that act within the relevant statutory period") (citing *Morgan*, 536 U.S. at 112-13); *Selan v. Kiley*, 969 F.2d 560, 567 (7th Cir. 1992) (holding that a two-year gap was too long). Counts 2 and 3 are therefore dismissed.

Counts 4, 5, and 6, by contrast, survive. For the reasons described above, Defendants are correct that Arce may not recover for any alleged acts in violation of the ADA or Title VII that

predate February 23, 2012. Yet Arce did allege at least some post-February 23, 2012 acts that are plausibly discriminatory. Count 4 alleges discrimination on the basis of Arce's disability; his first EEOC charge timely alleged that Defendants violated the ADA by refusing to assign him to light duty on December 4, 2012. Doc. 44-2. Count 5 alleges that Defendants retaliated against Arce for his complaints about the workplace. Doc. 44 at p. 23, ¶¶ 29-30. True, Arce's first EEOC charge improbably suggests that the November 7, 2012 ultimatum was in retaliation for Arce's 2009 complaint (Defendants patiently laid in wait for *three years* to get their revenge?), Doc. 44-2, and Count 5 makes non-specific allegations of retaliation, Doc. 44 at p. 22, ¶ 24 ("Plaintiff frequently from on or about 1998 through 2013 complained about harassing treatment"); *id.* at p. 23, ¶ 29 ("Plaintiff was subjected to a constant barrage of threats from Carduff and Murphy including that if Plaintiff complained about overtime or other terms he would be put on the dark side."). Yet the EEOC charge at least mentions retaliation, thereby giving Defendants and the EEOC *some* notice of the claim. *Cf. Cheek*, 31 F.3d at 502 (noting an EEOC charge's "dual purpose of giving [Defendant] notice of the factual basis for the claims of sex discrimination in [Plaintiff's] complaint, and of affording the EEOC an opportunity to investigate the claims."). And the operative complaint, although admittedly in support of Count 7, not Count 5, alludes to Defendants' retaliating against Arce for April 2012 testimony on behalf of a union steward who had also alleged workplace discrimination. Doc. 44 at p. 27, ¶ 27. Although the issue is close, Count 5 survives dismissal.

Count 6 alleges that Arce was "constructive[ly] discharge[d]" on the basis of his race or national origin. A constructive discharge "address[es] situations in which employers coerce[] employees to resign, often by creating intolerable working conditions, in retaliation for employees' engagement in protected activities." *Pa. State Police v. Suders*, 542 U.S. 129, 141

(2004).  As the Seventh Circuit put it: "Constructive discharge refers to a situation in which an employee is not fired but quits, but in circumstances in which the working conditions have made remaining with this employer simply intolerable."  *McPherson*, 379 F.3d at 440 (internal quotation marks omitted); *see also* Note, "That's It, I Quit: Returning to First Principles in Constructive Discharge Doctrine," 23 *Berkeley J. Emp. & Lab. L.* 401, 443 (2002) ("The point of constructive discharge is to recognize that an employer is responsible for deliberately creating working conditions so intolerable that a reasonable person would be forced to resign."), *cited in Suders*, 542 U.S. at 142.

Dismissal of Count 6 would be inappropriate in light of Arce's allegations that he was physically incapable of returning to work in November 2012 without an accommodation, which Defendants refused to grant, and that facing a looming January 7, 2013 deadline to choose either retirement or the loss of his benefits, he quit.  Doc. 44 at p. 24, ¶¶ 25-27.  Under these circumstances, it seems unreasonable to require Arce to have "remain[ed] employed while seeking redress," *McPherson*, 379 F.3d at 440, in order to preserve a constructive discharge claim—or, alternatively, to be fired and lose his benefits in order to preserve a straightforward "adverse employment action" claim, *see Phelan v. Cook Cnty.*, 463 F.3d 773, 780 (7th Cir. 2006) (plaintiff must show only that an "adverse employment action" was motivated by discriminatory animus in order to recover).  *Cf. Hinthorn v. Roland's of Bloomington, Inc.*, 503 N.E.2d 1128, 1130 (Ill. App. 1987) ("If an employer can obtain resignations from weaker willed and less sophisticated employees in order to retaliate against them for exercise of rights involving a public policy by threatening discharge, even by implication, the remedy promulgated by the retaliatory discharge doctrine can be significantly impaired."), *aff'd*, 519 N.E.2d 909 (Ill. 1988). Defendants' motion to dismiss Count 6 is therefore denied.

Two final notes. First, although Arce may not recover for any pre-February 23, 2012 acts under Title VII or the ADA, that is not to say that such acts are irrelevant; for under either statute, Arce may "us[e] the prior acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. Second, because the operative complaint lists only CTA as a defendant on the Title VII and ADA counts, Doc. 44 at pp. 15, 17, 19, 22, 24, the court need not reach Defendants' argument that the EEOC charge letters failed to name Carduff or Murphy. *Cf. Cheek*, 31 F.3d at 502 ("[T]he charge is unrelated to the claims in count I in at least two ways: the type of conduct alleged to be discriminatory, and *the identity of the individuals involved*. These differences between the claims in the complaint and the allegations in the charge cannot be overlooked, even under the liberal standard of pleading applied to allegations in an EEOC charge.") (emphasis added).

## II.    **42 U.S.C. §§ 1981 and 1983 Claims**

The second amended complaint alleges that Carduff, Murphy, and CTA created a hostile work environment for Arce (Count 1), retaliated against him (Count 7), and constructively discharged him (the first of two "Count 8"s, which the court will call "Count 8A") on the basis of his race or national origin, all in violation of § 1981. Doc. 44 at 4, 26, 29. Title VII's comprehensive remedial scheme likely does not preclude Arce's alleging a violation of § 1981 for the same conduct. *See Trigg v. Fort Wayne Cmty. Sch.*, 766 F.2d 299, 302 (7th Cir. 1985) (holding that Title VII does not preempt actions against state actors under § 1983); *see also Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 459 (1975) (holding that Title VII does not preempt actions against non-state actors under § 1981). Because Defendants are state actors, however, § 1981 does not provide a direct cause of action against them; instead, Arce must bring his § 1981 claims through the vehicle provided by § 1983. *See Campbell v. Forest Pres. Dist. of Cook Cnty.*, 752 F.3d 665, 671 (7th Cir. 2014) ("We now join the overwhelming weight of

authority and hold that … § 1983 remains the exclusive remedy for violations of § 1981 committed by state actors.").  The upshot is that a two-year statute of limitations applies to Arce's claims.  *See id*. at 667-68 (holding that § 1983 borrows the forum state's personal-injury statute of limitations, which in Illinois is two years).

Arce filed this suit on January 7, 2014, so only conduct after January 7, 2012 is actionable.  That is nearly the same timeframe as for his Title VII claims (from February 23, 2012 onward), and the substantive standard on the claims is also the same, *see Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010) ("The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983.").  Accordingly, Count 1 fails for the same reason as Counts 2 and 3, namely, a failure to allege any acts within the limitations period that could plausibly have contributed to a hostile work environment.

As with his Title VII claims, Arce seeks leave to replead, claiming that he can allege new acts within the two-year window.  Here is what Arce would add: "each six months [CTA] conducts a 'pick' [for trucks] and from January 2010 until plaintiff's separation for his employment would be an event within the statute that plaintiff was not allowed to pick which would place an additional four acts within the 2 year limitations period."  Doc. 61 at 3.  Because Arce was allegedly once denied his choice of Truck 262 in October 2009, he would like the court to assume that Defendants would have continued to improperly deny him his pick of trucks for four years thereafter, and that these notional denials after January 2012 are actionable, even though Arce was not working—was *incapable* of working, according to the complaint, Doc. 44 at p. 24, ¶ 27—and so would not have been able to pick a truck during that time anyway.  Put differently, Arce's theory appears to be that Defendants' imaginary denials of Arce's hypothetical picks somehow violate § 1981.  Needless to say, a plaintiff may not sue for a

hypothetical violation of his civil (or any other) rights, much less use the nonexistent violations to rescue otherwise time-barred claims. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("That Lyons may have been illegally choked by the police on October 6, 1976 … does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part.").

Arce does argue that at least one act is within the limitations period: *his* discovery, in January 2014, of the falsely "withdrawn" accommodation letter from October 2009. Doc. 44 at p. 10, ¶ 56. Arce does not, however, explain how this discovery, long after he had stopped working at CTA, contributed to a hostile work environment. Maybe he means to say that Defendants' *hiding* the accommodation from him contributed to a hostile work environment. But that argument would fail because, as mentioned, "[a] plaintiff bringing a hostile environment claim must establish that the workplace was both subjectively and objectively offensive." *Ezell*, 400 F.3d at 1047. By definition, Defendants' concealment could not have been subjectively offensive to Arce because he was unaware that they were concealing anything.

The court is mindful that "because the period of limitations is an affirmative defense it is rarely a good reason to dismiss under Rule 12(b)(6)." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004); *see Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) ("Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations.") (internal quotation marks omitted) (quoting *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009)). But "when a plaintiff's complaint nonetheless sets out all of the elements of an affirmative defense, dismissal

under Rule 12(b)(6) is appropriate." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)."). Arce's failure to allege timely acts—despite having had three shots at a complaint, and despite Defendants' having already moved to dismiss his first amended complaint on limitations grounds, Doc. 22 at 3-5—fits the bill. Besides, as discussed above regarding Arce's Title VII claims, even were the court to consider all of the (time-barred) allegations in the second amended complaint, Arce's hostile work environment claim would still fail on the merits. Count 1 is accordingly dismissed.

Counts 7 and 8A, by contrast, survive for the same reasons as Counts 5 and 6: Arce has plausibly alleged that Defendants retaliated against him for his April 2012 testimony, and that he was then coerced to retire under pain of losing his benefits in January 2013. That said, none of the operative complaint's timely allegations involving retaliation or forced retirement even mention Carduff or Murphy; instead, they name only Wall and other CTA employees. Carduff and Murphy are therefore dismissed as defendants on Counts 7 and 8A.

Arce's final claim under § 1983, the second "Count 8" (which the court will call "Count 8B"), alleges that CTA violated the Fifth and Fourteenth Amendments. Doc. 44 at pp. 36-40. Defendants are correct that the Due Process Clause of the Fifth Amendment applies only to federal, not state, actors, *see Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008); *Martinez-Rivera v. Sanchez Ramos*, 498 F.3d 3, 8-9 (1st Cir. 2007), and that none of the Fifth Amendment's other clauses could conceivably apply. As for the Fourteenth Amendment, Defendants argue only that Arce has not plausibly alleged a due process claim because he has not

identified a protected life, liberty, or property interest. Whether or not he has is irrelevant, though, because Arce's claim is grounded not in due process, but in equal protection. Doc. 44 at 36 (bringing Count 8B "against Chicago Transit Authority, based upon a denial of plaintiff's Fourteenth Amendment … right to equal protection of the laws"). Defendants do not even mention equal protection in their brief urging dismissal. Yet the two-year statute of limitations applies equally to this claim, and Arce does not allege any acts by Carduff and Murphy within the limitations period. Carduff and Murphy are therefore dismissed as defendants on Count 8B—and are therefore dismissed entirely from the case, making it unnecessary to reach their qualified immunity defense.

That leaves CTA as the only remaining defendant on Counts 7, 8A, and 8B, all brought under § 1983. Defendants do not argue that CTA, as a municipal entity, *see Bester v. Chicago Transit Auth.*, 887 F.2d 118, 119 (7th Cir. 1989) ("Chicago Transit Authority is a statutorily created, tax-exempt municipal corporation"), is immune from liability under § 1983 except under the limited circumstances outlined in *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The Seventh Circuit has explained:

> Recovery under § 1981 is problematic, however, for although the accused perpetrators of discrimination are the teachers and administrators at the schools where Smith worked, the only defendant is the School Board, an agency of municipal government—and recovery against a governmental body under § 1981 may not be based on *respondeat superior*. The plaintiff must show that the body's official policy or custom was discriminatory. Demonstrating that an executive official, even a high ranking one, engaged in discrimination is insufficient.

*Smith v. Chicago Sch. Reform Bd. of Trustees*, 165 F.3d 1142, 1148 (7th Cir. 1999) (citations omitted). As Defendants have not argued for dismissal on the ground that Arce has failed to plausibly allege a *Monell* claim, and because Counts 7, 8A, and 8B otherwise state valid claims, their motion to dismiss those counts as to CTA is denied.

**III.    State Law Emotional Distress Claims**

Counts 9 and 10 allege that CTA intentionally and negligently inflicted emotional distress, in violation of Illinois law.  "Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress only if she establishes that: (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress."  *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604-05 (7th Cir. 2006) (quotation marks omitted); *see McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (same).

Defendants argue that none of their alleged conduct was "extreme and outrageous."  "Conduct is extreme and outrageous only if the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency."  *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997) (Illinois law) (quotation and alteration marks omitted).  As the Supreme Court of Illinois has explained:

> [L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or trivialities.  "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."

*Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976) (quoting *Restatement (Second) of Torts* § 46, cmt. d (1965)).  Illinois sets a particularly high bar for "extreme and outrageous" behavior in the employment context: "[C]ourts often hesitate to find a claim for intentional infliction of emotional distress in employment situations.  Courts are concerned that, if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise

19

to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 867 (Ill. App. 2000) (citation omitted). Arce does not allege anything more than garden variety employment discrimination, which Illinois courts have consistently refused to find rises to the level of intentional infliction of emotional distress. *See Breneisen v. Motorola, Inc.*, 512 F.3d 972, 983 (7th Cir. 2008) (Illinois law); *Bannon v. Univ. of Chicago*, 503 F.3d 623, 630 (7th Cir. 2007) (Illinois law); *Graham*, 742 N.E.2d at 867; *Vickers v. Abbott Labs.*, 719 N.E.2d 1101, 1115 (Ill. App. 1999); *Lundy v. City of Calumet City*, 567 N.E.2d 1101, 1102-03 (Ill. App. 1991); *Miller v. Equitable Life Assurance Society*, 537 N.E.2d 887, 889 (Ill. App. 1989).

That said, "[c]ourts have found outrageous behavior where defendants threatened to exercise their power to coerce plaintiffs into doing something they would not otherwise do. *When an employer's conduct is both coercive and retaliatory*, courts have generally found the conduct to be extreme and outrageous, constituting a claim for intentional infliction of emotional distress." *Graham*, 742 N.E.2d at 867-68 (emphasis added, citation omitted). Arce alleges that Defendants retaliated against him for his April 2012 testimony and coerced him into retirement. Yet the behavior he alleges is far less outrageous than the situations described in *Graham* and the cases cited therein. *See ibid*. (holding that a five-month-long sham investigation of employee, and defamatory statements made about him, in retaliation for reporting nuclear safety violations to the NRC was outrageous); *Pavilon v. Kaferly*, 561 N.E.2d 1245, 1251-52 (Ill. App. 1990) (holding that pressuring employee for dates, offering her money for sexual favors, firing her when she refused, and then threatening to rape and kill her was outrageous); *Milton v. Ill. Bell Tel. Co.*, 427 N.E.2d 829, 831 (Ill. App. 1981) (holding that coercing employee to illegally falsify work reports and retaliating against him when he refused to do so was outrageous).

Arce's own allegations admit that Wall told him in November 2012 that he had to return to work "because [he] ha[d] been in an inactive employment status in excess of the maximum time permitted," Doc. 44-2 at 2, and that Wall denied his request for light duty in December 2012 because "there was no alternate position available," *id.* at 3, and would not let him drive a truck because Arce "was a threat because of the medication [he] took," Doc. 44-4 at 2. Enforcing the terms of an employment contract regarding the maximum amount of leave, or ensuring safety by refusing to allow employees to drive trucks while on medication, are the kinds of legitimate employer interests that—though pursued insensitively, even discriminatorily—do not rise to the level of extreme and outrageous behavior. *See Vickers*, 719 N.E.2d at 1115 (holding that conducting an allegedly bad faith disciplinary investigation and coercing plaintiff to accept a demotion was not outrageous); *Lundy*, 567 N.E.2d at 1102-03 (holding that relieving the plaintiff officers of uniformed duty, confiscating their guns and badges, and telling their coworkers that they may be suffering from schizophrenia or hysteria on the basis of an inconclusive psychological evaluation was not outrageous). Arce has therefore failed to state a claim for intentional infliction of emotional distress.

"Illinois courts treat claims by direct victims of negligent infliction of emotional distress under the same approach used for standard negligence claims." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009) (citing *Corgan v. Muehling*, 574 N.E.2d 602, 606 (Ill. 1991)). "In other words, a party advancing a negligent infliction of emotional distress claim must demonstrate a defendant's duty, as well as a breach that proximately caused the claimant an injury." *Ibid.* (citing *Parks v. Kownacki*, 737 N.E.2d 287, 296-97 (Ill. 2000)). In addition, "a direct victim of alleged negligent infliction of emotional distress must satisfy the 'impact' rule. Under the impact rule, a direct victim may not recover for emotional distress suffered as a result

of the defendant's alleged negligence unless the emotional distress 'was accompanied by a contemporaneous physical injury to or impact on the plaintiff.'" *Ibid.* (quoting *Rickey v. Chicago Transit Auth.*, 457 N.E.2d 1, 2 (Ill. 1983)) (citation omitted). Arce has not alleged any contemporaneous physical injury or impact, and so his claim for negligent infliction of emotional distress also fails.

Even if Arce's emotional distress claims did not fail on the merits, they would likely be preempted. Under the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.*, common law claims "inextricably linked" to statutory civil rights violations are barred. *Geise v. Phoenix Co. of Chicago*, 639 N.E.2d 1273, 1277 (Ill. 1994) (affirming dismissal of the plaintiff's common law claims because they were "inextricably linked to the [Title VII] claims" and that "[a]bsent the allegations of sexual harassment, Geise would have no independent basis for imposing liability" on the common law claims); *see* 775 ILCS 5/8-111(D) ("Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act."); *Krocka v. City of Chicago*, 203 F.3d 507, 517 (7th Cir. 2000) (Illinois law) (holding that an emotional-distress claim was preempted where the plaintiff "based his IIED claim on several statements made by CPD employees that referred to his mental condition," the same basis as for his ADA claims). Arce's emotional distress claims are indisputably "inextricably linked" to his Title VII and ADA claims; the factual bases for all of the claims are materially identical. Doc. 44 at pp. 40-45. So even had Defendants' alleged conduct been extreme and outrageous, and even had Arce alleged a contemporaneous physical injury, both emotional distress claims still would fail. *See Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899, 905 (7th Cir. 2002) (Illinois law) (holding that the plaintiff's emotional distress claim was preempted because it was "supported by factual allegations identical to those set forth

in her Title VII sexual-harassment claim"); *Smith*, 165 F.3d at 1151 (dismissing the plaintiff's common law tort claim because "[r]acial discrimination was not 'merely incidental' to" the tort claim but was "the core of [the plaintiff's] theory").

## Conclusion

Defendants' motion to dismiss the second amended complaint is granted on Counts 1, 2, 3, 9, and 10. On Counts 4, 5, 6, 7, 8A, and 8B, the motion to dismiss is granted with respect to Carduff and Murphy and denied with respect to CTA. Accordingly, Carduff and Murphy are dismissed from the suit, leaving Arce to proceed against CTA on Counts 4, 5, 6, 7, 8A, and 8B.

June 2, 2015

_____
United States District Judge