UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ISRAEL ARCE, | ) | |
| Plaintiff, | ) | |
| | ) | 14 C 102 |
| vs. | ) | |
| | ) | Judge Gary Feinerman |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

After being terminated by his employer, the Chicago Transit Authority ("CTA"), Israel

Arce filed this suit, alleging discrimination on the basis of his race, national origin, and disability

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and the Fourteenth

Amendment's Equal Protection Clause. Doc. 44. Earlier in the litigation, the court dismissed all

of Arce's claims against two individual defendants and certain of his claims against the CTA.

Docs. 102-103 (reported at 2015 WL 3504860 (N.D. Ill. June 2, 2015)). With discovery closed

and a jury trial set for August 8, 2016, Doc. 136, the CTA has moved for summary judgment on

the remaining claims, Doc. 155. The motion is granted.

**Background**

The following facts are set forth as favorably to Arce as the record and Local Rule 56.1

permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the

court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo*

*Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015).

One procedural issue must be addressed before setting forth the facts. Arce's Local Rule

56.1(b)(3)(B) response supports its denial of several paragraphs of the CTA's Local Rule

56.1(a)(3) statement by citing only the complaint. Doc. 181-1 at ¶¶ 33, 55-58, 62. That is improper. "The non-moving party's failure … to cite to any admissible evidence to support facts presented in response by the non-moving party render the facts presented by the moving party as undisputed." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *see also Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial."). The complaint is not admissible evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("[Federal Rule of Civil Procedure] 56(e) … requires the nonmoving party to go beyond the pleadings …."); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006) ("[T]he nonmoving party must … go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."); *Williams v. McCallin*, 439 F. App'x 707, 710 (10th Cir. 2011) (affirming summary judgment for the defendant where the plaintiff's "Statement of Facts" relied entirely on the complaint); *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990) (holding that pleadings may not be used to create disputed issues of fact on summary judgment). Accordingly, the above-cited paragraphs of the CTA's Local Rule 56.1(a)(3) statement are deemed admitted.

Arce, who is Puerto Rican, worked for the CTA as a service truck chauffeur from 1998 to 2013. Doc. 181-1 at ¶¶ 2-4, 27; Doc. 182-2 at 174. His primary responsibilities included driving trucks and passenger vehicles, loading and unloading trucks, and operating tow trucks and snowplows. Doc. 157-5 at 1. The CTA's written job description states that a service truck chauffeur is a "safety sensitive position." *Ibid*. Among other requirements, a service truck chauffeur must have a valid Illinois Class A CDL driver's license and must "pass drug and

alcohol testing as mandated by the Federal Transportation Administration." *Ibid*. Driving is an essential function of the service truck chauffeur position. Doc. 181-1 at ¶ 6. Arce denies that driving is an essential function of that position, arguing that only three of the twelve responsibilities listed on the job description include the term "driving." *Ibid*.; Doc. 157-5 at 1. But no reasonable jury could find that the ability to drive a truck was unessential for a job titled "truck chauffeur," especially because the position required a commercial driver's license.

On January 7, 2010, Arce injured his tailbone and lower back. Doc. 181-1 at ¶ 23. He was placed in "Area 605"—a designation for employees on temporary medical disability leave. *Id*. at ¶¶ 13-15; Doc. 183-1 at 25; Doc. 189-1 at 32. In a letter dated February 3, 2010, the CTA explained that Arce had been put on temporary disability leave "because [his] present medical condition [did] not meet the requirements of [his] current position." Doc. 157-3 at 11; *see* Doc. 181-1 at ¶ 16. On December 19, 2011, Arce requested a one-year extension of his disability leave; that request was granted. Doc. 181-1 at ¶ 17; Doc. 157-3 at 13. While he was on disability leave, Arce's doctor prescribed him OxyContin and Percocet. Doc. 181-1 at ¶¶ 24-25; Doc. 157-6 at 5.

The CTA refers to those medications as "narcotics," drawing an objection from Arce. Doc. 181-1 at ¶¶ 5, 26, 28-29, 62 ("Defendant presents no medical evidence as to the definition of narcotic and whether any medications in questions [sic] are indeed narcotics."). A "narcotic" is "[a]n addictive drug, esp. an opiate, that dulls the senses and induces sleep." Black's Law Dictionary 1182 (10th ed. 2014). Federal law defines "narcotics" to include "[o]pium, opiates, [and] derivatives of opium and opiates." 21 U.S.C. § 802(17)(A). Federal Rule of Evidence 201(b)(2) allows a court to "judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot

reasonably be questioned." Fed. R. Evid. 201(b)(2). The court takes judicial notice of the following facts. OxyContin is the brand name for oxycodone, which is classified as an opioid pain medication and a narcotic. *See* Drugs.com, http://www.drugs.com/oxycontin.html; Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/oxycodone-oral-route/description/drg-20074193. Percocet combines acetaminophen and oxycodone, and therefore is classified as an opioid pain medication and a narcotic. *See* Drugs.com, http://www.drugs.com/percocet.html; Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/oxycodone-and-acetaminophen-oral-route/description/drg-20074000.

During his first two years on temporary medical disability leave, Arce did not request an accommodation. Doc. 181-1 at ¶ 46. In Fall 2012, the CTA notified Arce that he was approaching the maximum time permitted for temporary leave, and cautioned that unless he returned to active employment status by January 7, 2013, he would be administratively separated from the CTA or he could retire, resign, or request a disability pension. Doc. 181-1 at ¶ 30; Doc. 157-6 at 7. On December 4, 2012, Arce submitted an accommodation request seeking a further extension of his disability leave (for an unspecified period of time) and other accommodations, including minimal commuting distance, parking close to work sites, standing and sitting breaks as needed, no physical exertion or workplace stress, a flexible work schedule, and "xyz" to be determined. Doc. 181-1 at ¶¶ 31-32; Doc. 157-6 at 10-12. According to Arce, those requests were just suggestions on which he was willing to compromise. Doc. 181-1 at ¶ 32. Following an accommodation review committee meeting, Arce's request was denied because, in the CTA's view, Arce remained unable to perform the essential functions of his position and there was no reasonable accommodation that would permit him to perform that position or any alternate position for which he qualified. *Id.* at ¶ 33.

4

On December 24, 2012, Arce filed another accommodation request seeking "light duty and/or re-assignments." Doc. 157-6 at 13; Doc. 181-1 at ¶ 37. Through January 2013, in an attempt to find a reasonable accommodation, the CTA and Arce exchanged emails, spoke via telephone, and participated in a face-to-face meeting along with Arce's wife and union representative. Doc. 181-1 at ¶ 43. As part of that process, the CTA discussed the terms of Arce's request and whether he could be accommodated either within or outside of his division. *Id*. at ¶ 44. The CTA disability accommodations committee also searched for open positions that could accommodate Arce's medical conditions—including his taking narcotic medications—but did not find any. *Id*. at ¶ 45; Doc. 191-1 at 73.

Arce disputes the facts set forth in the last two sentences of the previous paragraph because they rest solely on the testimony of Anna Cobb and William Mooney, CTA managers who participated in the accommodation review process. Doc. 181-1 at ¶¶ 44-45; Doc. 191-1 at 33; Doc. 194-1 at 36. Arce submits that the CTA must provide meeting agendas or written minutes to show that the above-referenced discussions took place. Doc. 181-1 at ¶¶ 44-45. Arce is mistaken, as the law does not require documentary evidence to prove what happened at a meeting or series of meetings. *See Thompson v. Bridgeton Bd. of Educ.*, 613 F. App'x 105, 108 n.2 (3d Cir. 2015) (rejecting a Title VII plaintiff's argument that the employer was required to submit documentary evidence to prove its non-discriminatory reason for failing to hire him).

On January 7, 2013, after determining that Arce could not be accommodated, the CTA "administratively separated" from him. Doc. 181-1 at ¶¶ 27, 55, 62. (The record does not indicate precisely what "administratively separated" means, other than that it is effectively a termination. The record also is unclear as to whether Arce retired under pressure or was affirmatively terminated; that question is immaterial because the legal principles set forth below

apply with equal force to both.)  The central issue in this case is what motivated CTA's decision to terminate Arce.  Mooney testified that, as a general policy, CTA employees with safety sensitive positions are not allowed to take narcotics while working.  Doc. 157-2 at 13; Doc. 181-1 at ¶ 5.  And the CTA submits that Arce's physicians never cleared him to return to work in any capacity.  Doc. 157-6 at 14; Doc. 181-1 at ¶¶ 26, 36, 38, 39-41.

The CTA's submission is correct.  The Physical Capacities Evaluation ("PCE") form attached to Arce's first accommodation request—the one made on December 4, 2012—said that his ability to return to work within 90 days was "to be determined" and that he was still on medication.  Doc. 181-1 at ¶ 35.  Likewise, the PCE that Arce provided at his January 2013 meeting with the CTA accommodation committee said that Arce could "possibly" return to work within 90 days "if modified duty.  To be determined," adding "[p]atient under medication."  Doc. 192-1; Doc. 181-1 at ¶¶ 40-41.  The CTA's Local Rule 56.1(a)(3) statement asserts that, at the time of Arce's second accommodation request—the one made on December 24, 2012—Arce's physician had not released him to return to work in any capacity.  Doc. 181-1 at ¶ 39.  In support, the CTA cites Arce's deposition testimony:

> Q.  At the time you prepared this second request, were you still seeing Dr. Matias?
>
> A.  Yes. Yeah. We were—yeah, I was working with Dr. Matias at that time. I'm kind of sure about this.
>
> Q.  And Dr. Matias had still not released you to return to work in any capacity, right?
>
> A.  In my best of my knowledge, no, because of my condition.
>
> Q.  Because of your condition?
>
> A.  Yes, ma'am.

Doc. 182-2 at 137. The CTA's Local Rule 56.1(a)(3) statement also asserts that since Arce's termination on January 7, 2013, no physician has authorized him to work in any capacity. Doc. 181-1 at ¶ 27. That is correct as well. When asked at his deposition, "Since the date of your administrative separation, has your doctor authorized you to return to work in any capacity," Arce responded, "No, ma'am." Doc. 182-2 at 200.

Arce later submitted an errata sheet—which spans 35 pages and has several dozen (!) entries—to amend both of his above-referenced answers to say, directly contrary to his deposition testimony, that a doctor *had* released him to work 8 hours per day. Doc. 190 at 15 (amending his answer to say, "Dr. Matias did release me to work modified duty, limited duty where he used the P.C.E. marking activity boxes totaling over 8 hours therefore a full day work release"); *id*. at 31 (amending his answer to say, "Dr. Matias P.C.E. released me in limited capacity at 8 hours per day"). Those two errata are improper and accordingly are rejected.

Rule 30(e)(1) provides that "the deponent must be allowed 30 days after being notified by the officer that the transcript … is available in which: … (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1). The Seventh Circuit has held that, absent a transcription error, the Rule does not allow post-deposition changes that contradict the deponent's testimony: "We … believe, by analogy to the cases which hold that a subsequent affidavit may not be used to contradict the witness's deposition, that a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) (citations omitted); *see also ibid*. ("a deposition is not a take home examination"); *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225-26 (9th Cir. 2005)

(holding that "Rule 30(e) is to be used for corrective, and not contradictory, changes"). As one court ably put it: "The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard." *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992).

Arce wishes that he had answered "yes" rather than "no" to the questions whether his doctors ever cleared him "to return to work in any capacity." To justify what he calls "non-contradictory substantive change[s]," Arce explains that he misinterpreted the questions and was mentally exhausted. Doc. 190 at 15, 31. Those explanations are insufficient, as the errata cannot fairly be called "non-contradictory," as nothing contradicts "yes" more than "no." Because the errata cannot "plausibly be represented as the correction of an error in transcription," *Thorn*, 207 F.3d at 389, they are stricken, and Arce's answer shall stand as transcribed. *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 267-68 (3d Cir. 2010) ("As a general proposition, a party may not generate from whole cloth a genuine issue of material fact (or eliminate the same) simply by re-tailoring sworn deposition testimony to his or her satisfaction.").

Arce did testify that Dr. Matias told him in 2011 that "in a short period of time after we completed this program and this injection and this medication your issue with your tailbone should be corrected and you should go back to work light duty." Doc. 182-2 at 112-13; *see* Doc. 181-1 at ¶ 26. That is, Arce testified that Dr. Matias told him in 2011 that *should* his treatment be effective, he *could* return to work on light duty. But Arce also testified that his doctor never took him off his medications and never released him to return to work. Doc. 182-2 at 113, 137, 200. Accordingly, Arce's testimony is that Dr. Matias said that he *could* return to light duty work *if* he stopped taking his medications, but that he *in fact* never stopped taking his

medications and was *never* released to return to work. And in any event, Arce's testimony about his doctor's statement is inadmissible hearsay and thus may not be used to defeat summary judgment. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563-64 (7th Cir. 1996) (holding that the ADA plaintiff's testimony that his doctor told him that he could return to work part time was inadmissible hearsay not subject to any exception).

Arce also cites the PCEs as evidence that he was capable of working. Doc. 181-1 at ¶ 54. But, as noted, both PCEs stated that it was "to be determined" whether Arce could return to work. Doc. 192-1; Doc. 192-2. Therefore, because Arce's Local Rule 56.1(b)(3)(B) response does not cite any evidence—such as an affidavit from himself or his doctors—other than the PCEs and his errata sheet to support his denial of the CTA's assertion that his doctors never released him to return to work, that assertion is deemed admitted.

While acknowledging that his medication regimen contributed to his administrative separation, Doc. 181-1 at ¶ 55; Doc. 182-2 at 193, Arce believes the CTA had other, more invidious reasons for forcing him out—namely, discrimination on the basis of his race, national origin, and disability. To support this theory, Arce relies primarily on his own deposition testimony. Doc. 181-1 at ¶¶ 8, 47, 59. Much of the testimony cited by Arce simply states his belief that the CTA's treatment of him was due to his being Puerto Rican and/or disabled. Doc. 182-2 at 19-20 (referencing "the discrimination and the hostile activity that is going on there for years"); *id*. at 82 ("I want compensation for discrimination, retaliation, mental and physical abuse, the stress, [and] the humiliation that I suffer."); *id*. at 174 ("What was the retaliation for? I'm Puerto Rican. I'm disabled."); *id*. at 192 (testifying that he reported his concerns over discrimination "[t]o my coworkers in basic conversations"). Arce also cites the following testimony:

A. It is under CTA discretion every time they see the progress that I was making when I surrendered my physical capacity evaluation and they would see the progress they should be able to say "Okay, Mr. Arce. You are getting progress. We're going to give you this light duty like they did with other people, white people."

…

Q. And you believe that concealment of that [accommodation plan] by Mr. Wall and Ms. Cobb was, in fact, discriminatory against you?

A. That's the way I look at it. Yes, it's discriminatory.

Q. And it violated your rights under the 14th Amendment?

A. That's correct.

Q. And is it your contention that Mr. Wall and Ms. Cobb discriminated against you or denied you your rights under the Americans with Disabilities Act by not trying to negotiate something with you based on what your medical was and what jobs were available at the CTA?

A. Yes.

Q. And do you believe that the CTA discriminated against you by endeavoring to enforce the no extension rule of the 605 policy when the ADA was in force at that time?

A. That's correct. That was discriminatory in my opinion, yes.

Q. And do you think that—is it your opinion that the CTA was discriminating against you and violated your rights under the equal protection clause by allowing white employees to—who couldn't drive to remain working in the West Shops?

A. Yes.

Q. And do you believe it was a violation of those same rights to not allow you as a disabled or partially disabled worker to remain in the West Shops when white employees were able to do that?

A. Yes.

Doc. 182-2 at 247-53.

Two recent Seventh Circuit decisions inform the court's consideration of that testimony:

*Packer v. Trustees of Indiana University School of Medicine*, 800 F.3d 843 (7th Cir. 2015), and

*Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452 (7th Cir. 2015). In *Packer*, the plaintiff professor alleged that she was fired due to her sex, while the university said that she had persistently failed to meet expectations, particularly with respect to securing research grants. 800 F.3d at 845. To support her claim, the plaintiff submitted an affidavit describing a meeting where the dean told her and three male professors that they would no longer have careers at the university if they did not obtain National Institute of Health ("NIH") funding. *Id.* at 850. The affidavit further averred that her male colleagues were not fired even though they never acquired NIH funding. *Ibid.* The Seventh Circuit disregarded the second averment:

> [The plaintiff] is certainly competent to offer testimony as to what occurred during the meeting with [the dean] and what happened to her own salary, assigned lab space, and status after that meeting. But her affidavit gives the reader no reason to believe that she has the requisite personal knowledge of—to cite one example—what grant funding her male colleagues did or did not obtain in the months after the meeting with [the dean]; for all we know, that assertion may be founded entirely on hearsay.

*Ibid.*

In *Ani-Deng*, the plaintiff was demoted, purportedly for making too many visits to the First Aid unit. 777 F.3d at 453. The plaintiff submitted an affidavit from a human resources employee averring that the company's labor relations manager terminated the plaintiff because she was an African-American woman. *Id.* at 454. The affidavit also said that the plaintiff's white, male coworkers visited First Aid often but were never demoted. *Ibid.* The Seventh Circuit held that the affidavit

> was entitled to no weight, as it had no foundation. "A [lay] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter," Fed. R. Evid. 602, though personal knowledge can include inferences—most of our personal knowledge is inferential. The affidavit itself could have contained the requisite evidence, since it is under oath. Had Miller's affidavit stated for example that she had overheard a company official say that he'd get the plaintiff fired because she was foreign, the affidavit, or at least that part of it, would have been admissible. But without

11

such first-hand evidence in the affidavit itself—and there wasn't any—Miller needed discovery to establish the admissibility of the assertions in the affidavit.

…

The affidavit fails also to indicate what basis the affiant had for thinking that white welders and male welders (white or black?) who made many First Aid Visits because of overheating were not punished by being demoted, or how the affiant learned that the company's labor relations manager was trying to fire the plaintiff in stages—did he tell the affiant that? Did she overhear him tell someone else? There is no evidence to suggest that Miller had personal knowledge of the manager's supposed scheming.

*Id*. at 454-55 (citations and internal quotation marks omitted).

Arce's above-quoted testimony states, in general terms, that he believes that he was discriminated against; that white, disabled employees had been allowed to return to work while he was not; and that white employees were given preferential treatment. As in *Packer* and *Ani-Deng*, that testimony lacks foundation and is entitled to no weight because it does not suggest that Arce's assertions are based on personal observation or first-hand knowledge.

Arce does cite three slightly more specific portions of his deposition transcript to support his claims. First, Arce testified that during his tenure at the CTA, "white people" with less seniority received more overtime than he did, even though overtime was supposed to be assigned based on seniority. Doc. 181-1 at ¶ 8. The testimony reads:

So much stuff it is amazing. I go to work Monday, for example, and my coworker asked me "Did you work on the weekend?" I say "No. Why?" He said "Because you was on the list to work on the weekend." I said "Nobody calls. I have the phone, nobody called" and the first seven or eight years there was hardly calling me for overtime, they were passing me, and then when I inquired about the list that I learned later on about the overtime list and then I was on top of it and even that way I have a phone and they did not call me and they ask me, my coworker, "Did you work Saturday? Did you work Sunday?" "No." They say "Someone took your spot. You missed work." I said "Well, they didn't call me." So what do you call that? Discrimination? They were calling guys under me white people with less seniority than me and they were making the money and I'm there having more than five years seniority over them or three years seniority over them and they are getting the overtime.

12

Doc. 182-2 at 52-53. Arce's testimony that white employees with less seniority received more overtime rests on hearsay, and therefore is disregarded. The only basis for Arce's testimony is what some "coworker" told him, and what that coworker told him is an out-of-court statement offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c).

Although the statement was from a coworker, it does not qualify as non-hearsay under Rule 801(d)(2)(C) (a statement "made by a person whom the party authorized to make a statement on the subject") or Rule 801(d)(2)(D) (a statement "made by the party's agent or employee on a matter within the scope of that relationship and while it existed"). As for Rule 801(d)(2)(C), there is nothing in the record indicating that the CTA authorized the coworker to make statements about the overtime worked by others. And as for Rule 801(d)(2)(D), "[n]ot everything that relates to one's job falls within the scope of one's agency or employment." *Bordelon v. Bd. of Educ. of Chi.*, 811 F.3d 984, 992 (7th Cir. 2016). There is nothing in the record indicating that telling Arce about overtime worked by others was made within the scope of the coworker's employment relationship with the CTA. *See Stephens v. Erickson*, 569 F.3d 779, 793-94 (7th Cir. 2009).

Second, Arce testified that a coworker, Michelle Cregan, had also been injured but, unlike Arce, was allowed to return to work. Doc. 182-2 at 230-31. In Arce's view, the only possible explanation for this different treatment is discrimination. *Ibid*. However, it turns out that Cregan was initially prohibited from working because she was on Vicodin, a narcotic pain medication. Doc. 183-1 at 44. It was only when she *stopped* taking Vicodin and switched to ibuprofen that she was permitted to return to her job. *Ibid*.

Third, to support his view that he was discriminated against because he was not allowed to pick his truck assignment once he was placed in Area 605, Arce testified that a Caucasian

coworker named Ron Kaminski was permitted to pick his assignment despite being injured. Doc. 181-1 at ¶¶ 18-20; Doc. 182-2 at 48. As Arce admitted, however, Kaminski had *not* been placed in Area 605—meaning that, unlike Arce, Kaminski was not on temporary disability leave. Doc. 182-2 at 48.

The parties dispute whether Arce's division at the CTA had "light duty" positions. Doc. 181-1 at ¶ 68. The CTA denies that light duty positions existed. *Ibid*. In support, it cites Mooney's testimony that there are no "light duty" jobs, but rather that there are "transitional return to work" positions for injured employees returning to work with temporary restrictions "with the expectation that [they will] be returned to full duty within 90 days." Doc. 194-2 at 36. According to Mooney, an employee's duties may be modified while in this transitional program as an accommodation. *Id*. at 38. Arce, by contrast, asserts that the CTA has light duty positions, Doc. 181-1 at ¶ 68, and cites his own testimony that light duty is "where they have the white people sitting on a bench for eight hours doing nothing," Doc. 182-2 at 114. This dispute is largely semantic—both Mooney and Arce describe a program under which employees with disabilities may return to work with modified responsibilities. To the extent the testimony conflicts, the court credits Arce's view. But it remains undisputed that those light duty positions were *temporary*; while Mooney testified to as to their temporary nature, Arce does not assert, let alone adduce evidence, that the positions were anything other than temporary.

Finally, Arce was aware of the CTA's anti-discrimination policies, but he never reported to CTA management any alleged discriminatory or retaliatory treatment. Doc. 181-1 at ¶ 57.

### Discussion

Arce alleges that: (1) he was terminated or constructively discharged and retaliated against on the basis of his race and national origin, in violation of Title VII; (2) the CTA failed to

14

accommodate his disability and discriminated against him because of his disability, in violation

of the ADA; and (3) he was discriminated against because of his race, national origin, and

disability, in violation of the Equal Protection Clause.

**I.      Title VII Termination/Constructive Discharge and Retaliation Claims**

To prevail on a constructive discharge claim, a Title VII plaintiff "must show that the

constructive discharge was motivated by discriminatory intent." *EEOC v. Univ. of Chi. Hosps.*,

276 F.3d 326, 333 (7th Cir. 2002). The same holds for an ordinary termination claim. *See Smith

v. CTA*, 806 F.3d 900, 906 (7th Cir. 2015). Arce may show discriminatory intent under either the

direct method or indirect method. *See Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784,

789-90 (7th Cir. 2015); *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014).

"Under the 'direct method,' the plaintiff may avoid summary judgment by presenting

sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus

motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir.

2012). The appropriate focus under the direct method "is not whether the evidence offered is

direct or circumstantial but rather whether the evidence points directly to a discriminatory reason

for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal

quotation marks omitted); *see also Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013)

("The plaintiff's task in opposing a motion for summary judgment is straightforward: he must

produce enough evidence, whether direct or circumstantial, to permit the trier of fact to find that

his employer took an adverse action against him because of his race."); *Everett v. Cook Cnty.*,

655 F.3d 723, 729 (7th Cir. 2011); *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664,

672 (7th Cir. 2011).

"Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. In short, [d]irect evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus."  *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (alteration in original) (citations and internal quotation marks omitted); *see also Morgan*, 724 F.3d at 995; *Coleman*, 667 F.3d at 860; *Everett*, 655 F.3d at 729.  "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.  That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action."  *Rhodes*, 359 F.3d at 504 (citations and internal quotation marks omitted); *see also Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014); *Perez v. Thorntons, Inc.*, 731 F.3d 699, 710 (7th Cir. 2013); *Morgan*, 724 F.3d at 995-96; *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012); *Everett*, 655 F.3d at 729 (explaining that circumstantial evidence is "evidence that points to discriminatory animus through a longer chain of inferences").  Circumstantial evidence typically falls into one of three categories: "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action."  *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011); *see also Chaib*, 744 F.3d at 982; *Perez*, 731 F.3d at 711; *Morgan*, 724 F.3d at 995-96; *Coleman*, 667 F.3d at 860; *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011).  To overcome summary judgment, circumstantial evidence need not "combine to form a tidy, coherent picture of discrimination, in the same way the tiles of a mosaic

come together to form a tidy, coherent image, in order for a plaintiff to survive summary judgment." *Morgan*, 724 F.3d at 997. Rather, "[i]f the plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate, and the plaintiff may prevail at trial even without producing any 'direct' proof." *Id*. at 996.

Arce cannot succeed under the direct method. He presents no direct evidence of discriminatory animus. As to circumstantial evidence, Arce does not adduce evidence of ambiguous statements. And while Arce does contend that Cregan and Kaminski were "similarly situated" to him and treated better than he was, he is wrong. "Similarly situated employees need not be identical to the plaintiff, but they do have to be directly comparable to the plaintiff in all material respects." *Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 262 (7th Cir. 2014) (internal quotation marks omitted). Cregan was not taking narcotic medications when she returned to work, and she was prohibited from returning so long as she was on narcotics; she therefore was subjected to the same rule as Arce was. And Kaminski, although injured, was not on disability leave (as Arce was) when he was allowed to pick a trucking assignment. These differences between Arce, on the one hand, and Cregan and Kaminski, on the other, are material because those are the precise differences that the CTA cites to justify its treatment of Arce.

Arce also testified that white coworkers with less seniority received more overtime than he did. Doc. 182-2 at 52-53. As noted above, that testimony rests on inadmissible hearsay and therefore may not be used to forestall summary judgment. *See Jackson v. City of Peoria*, __ F.3d __, 2016 WL 3125228, at *1 (7th Cir. June 3, 2016) (excluding the plaintiff's averments from consideration on summary judgment because they were based on inadmissible hearsay). Even if

that testimony were admissible, the fact that white coworkers with less seniority received more overtime than Arce does not give rise to a reasonable inference that the CTA terminated him because he is Puerto Rican.

As noted, "circumstantial evidence must be strong enough, taken as a whole, to allow the trier of fact to draw the necessary inference." *Morgan*, 724 F.3d at 995. For example, in *Good v. University of Chicago Medical Center*, 673 F.3d 670 (7th Cir. 2012), the plaintiff pointed to "three … employees of different races or ethnicities from hers" who were treated differently in response to their deficient performance; the three other employees were allowed to take demotions, while the plaintiff was terminated. *Id*. at 675. The Seventh Circuit held this evidence insufficient to satisfy the direct method because "it [did] not point to a discriminatory reason for [the employer's] decision to end her employment rather than demoting her as she would have wished. From this evidence, one might guess or speculate that perhaps [the plaintiff's] race might have made a difference in the decision, but guesswork and speculation are not enough to avoid summary judgment." *Ibid*. As the Seventh Circuit explained: "[The employer's] demotions of these … employees were insufficient circumstantial evidence under the direct method of proof, which requires evidence leading *directly* to the conclusion that an employer was illegally motivated, without reliance on speculation." *Id*. at 676. The same result obtains here, where the evidence of discrimination (allegedly unfavorable overtime practices) is far less probative of causation for the adverse act (termination) than it was in *Good*. *See Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 594 (7th Cir. 2008) ("Caskey suggests that we infer from these other terminations [of female employees] that she was the latest in a string of firings …. But her vague reference to a pattern, without any detail regarding the context of the other terminations, creates too sparse a trail to create circumstantial evidence of a causal connection.").

Arce's Title VII discharge claim also fails under the indirect method. That method, first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), has three steps. First, the plaintiff must make out a *prima facie* case of discrimination, which requires him to establish that: (1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably than he was. *See Coleman*, 667 F.3d at 845. Second, if the plaintiff makes out a *prima facie* case, "[t]he burden … shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its action. *Ibid.* (internal quotation marks omitted). Third, if the defendant articulates a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff, who must provide evidence that the defendant's stated reason is pretextual. *Ibid.*

Arce cannot make out the fourth element of his *prima facie* case because, as discussed above, neither Cregan nor Kaminski were similarly situated to him and Arce identifies no other comparators. He therefore cannot forestall summary judgment under the indirect method. *See Chaib*, 744 F.3d at 984 (holding that the plaintiff's case failed under the indirect method because she had "not shown that any nonfemale, non-French individual was subject to different treatment than the treatment of which she complains"); *Mustafa v. Ill. Prop. Tax Appeal Bd.*, 67 F. Supp. 3d 988, 998 (N.D. Ill. 2014) (granting summary judgment where the plaintiff "has not identified a similarly situated employee outside of his protected class(es) who behaved similarly but was treated more favorably than" he was).

As for the Title VII retaliation claim, both the direct and indirect methods require that Arce adduce evidence that he engaged in "a statutorily protected activity." *Caskey*, 535 F.3d at 593; *see also Malin v. Hospira, Inc.*, 762 F.3d 552, 558 (7th Cir. 2014); *Nichols v. S. Ill. Univ.-*

19

*Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).  A plaintiff engages in statutorily protected

activity by opposing a practice that he reasonably believed was prohibited by Title VII.  *See*

*O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011).  Arce has adduced no

evidence that he engaged in any statutorily protected activity before his discharge, and his

opposition brief does not argue that he did.  Doc. 181 at 6-7.  In fact, Arce admits that he "never

reported any alleged discriminatory or retaliatory treatment to CTA's EEO Unit or CTA

management."  Doc. 181-1 at ¶ 57.  *After* his discharge, Arce was interviewed as part of an

investigation into his former supervisor, but of course anything Arce said after his discharge

cannot have caused the discharge.  It follows that Arce's retaliation claim cannot survive

summary judgment under either the direct or indirect methods.

## II.     ADA Claims

The ADA provides that no "covered entity shall discriminate against a qualified

individual on the basis of disability," which includes failing to make "reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability who is an applicant or employee."  42 U.S.C. § 12112(a), (b).  A "qualified

individual" is defined as "an individual who, with or without reasonable accommodation, can

perform the essential functions of the employment position that such individual holds."  *Id.*

§ 12111(8).  To prevail on his ADA claims, Arce must adduce evidence sufficient for a

reasonable jury to find that he was a "qualified individual"—that is, that he could perform the

essential functions of his job with or without a reasonable accommodation.  *See Dunderdale v.*

*United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015).

As noted, the CTA requires that truck chauffeurs have a Class A CDL driver's license.

Doc. 157-5.  By statute and regulation, Illinois has adopted virtually all federal regulations

20

concerning commercial motor vehicle driver requirements.  *See* 625 ILCS 5/18b-105; 92 Ill. Admin. Code §§ 391.2000, 392.2000.  Federal regulations permit a person to drive a commercial motor vehicle only if that person does not use narcotics.  *See* 49 C.F.R. § 391.41(b)(12)(i) ("A person is physically qualified to drive a commercial motor vehicle if that person … [d]oes not use any drug or substance identified in 21 CFR 1308.11 Schedule I, an amphetamine, a narcotic, or other habit-forming drug."); *see also id.* § 391.11(a) ("[A] motor carrier shall not require or permit a person to drive a commercial motor vehicle unless that person is qualified to drive a commercial motor vehicle."); *id.* § 392.4(a)(3) ("No driver shall be on duty and possess, be under the influence of, or use … [a] narcotic drug or any derivative thereof.").

There is an exception for the "use of a substance administered to a driver by or under the instructions of a licensed medical practitioner … who has advised the driver that the substance will not affect the driver's ability to safely operate a motor vehicle."  *Id.* § 392.4(c).  That exception does not apply here because, as shown above, the record establishes that his doctor never cleared him to return to work.  Even Arce recognizes that he could not legally drive a commercial truck while on narcotics.  When asked, "By the state you cannot have that medication in your system and drive at the same time, correct?" Arce answered, "That's correct, ma'am.  I mean, we're talking about trucks, not cars. … Trucks is different—CDL is different rules.  Different applications."  Doc. 182-2 at 194.

Arce's brief retorts that "[d]riving is *a* function" of the truck chauffeur position but "not the *sole* function," suggesting that he could have worked as a truck driver even while taking narcotics.  Doc. 181 at 4 (emphasis added).  Arce also testified that he could still perform *some* of his former duties, such as washing the truck.  Doc. 157-5; Doc. 182-2 at 190-91.  But Arce's ability to perform certain ancillary duties of his position does not mean he could perform its

*essential* functions.  It is axiomatic that driving a truck is an essential function of being a truck

driver.  Accordingly, because Arce could not legally operate a truck while taking OxyContin and

Percocet, he could not have performed the essential duties of his truck chauffeur position.  *See*

*Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 828-31 (11th Cir. 2015) (in affirming summary

judgment, holding that the ADA plaintiff was not a "qualified individual" because his alcoholism

rendered him unqualified under federal regulations to operate a commercial truck); *Zizzo v. Jewel*

*Food Stores, Inc*., 2014 WL 5858363, *5-6 (N.D. Ill. Nov. 12, 2014) ("Because Zizzo used

narcotics, he could not, as a matter of law, be a qualified individual with respect to his original

position of driver.").

That does not entirely resolve the ADA claims, however, because "an employer may be

required to reassign a disabled employee to a vacant position if the employee no longer can

perform the essential functions of the job she holds." *Jackson v. City of Chicago*, 414 F.3d 806,

812-13 (7th Cir. 2005); *see also* 42 U.S.C. § 12111(9)(B) (defining "reasonable accommodation"

to include "reassignment to a vacant position").  "[The] duty to reassign a disabled employee has

limits.  The employer need only transfer the employee to a position for which the employee is

otherwise qualified." *Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) (internal

quotation marks omitted).  "Moreover, the employer is only obligated to assign an employee to

vacant positions, and is not required to 'bump' other employees to create such a vacancy.  Nor is

the employer required to create a new position for the disabled employee." *Baert v. Euclid*

*Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998) (citation omitted).  "It is the plaintiff's burden

to show that a vacant position exists for which he was qualified," *Ozlowski v. Henderson*, 237

F.3d 837, 840 (7th Cir. 2001), and "the employee must demonstrate that a vacant position exists

at the time of the adverse employment decision," *Dunderdale*, 807 F.3d at 856.  Finally, the

vacancy must be for a permanent position, not a temporary one. *See Ozlowski*, 237 F.3d at 842 (holding that the employer was not required to provide a disabled employee with a temporary position); *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997) ("Occasional opportunities to work in another department are not equivalent to a vacancy for a permanent position.").

Arce argues that "light duty" positions were made available to other injured employees—specifically, he testified that those other employers were allowed to "sit on a bench for eight hours. That's where they have the white people sitting on a bench for eight hours doing nothing." Doc. 182-2 at 114. Arce accordingly submits that there must have been a vacant "light duty" position available for him.

Even assuming that Arce has adduced evidence sufficient to show that there were vacant positions available for which he was qualified, there is no evidence that those positions were anything but temporary. As noted, Arce does not assert that the "light duty" positions were permanent, and nor has he adduced evidence that would permit a reasonable factfinder to infer that they were permanent. By contrast, the CTA has adduced uncontroverted evidence that those positions functioned as temporary assignments for employees recovering from injuries while they transitioned to full duty.

That dooms his accommodation claim. In *Watson v. Lithonia Lighting*, 304 F.3d 749 (7th Cir. 2002), the plaintiff suffered from repetitive-stress injuries that prevented her from performing assembly line work. *Id.* at 750. Having determined that she could not perform any subset of tasks that would enable her to continue working, the employer let her go. *Id.* at 751. In affirming summary judgment for the employer, the Seventh Circuit noted that "[a]n employer might establish a pool of light-duty positions … suited to employees recovering from injuries,"

23

but disagreed with the plaintiff's contention that "if an employer goes this far, it must allow an injured employee to occupy the light-duty (or limited task) position indefinitely." *Id*. at 752. As the court explained, "the ADA does not require an employer that sets aside a pool of positions for recovering employees to make those positions available indefinitely to an employee whose recovery has run its course without restoring that worker to her original healthy state." *Ibid*. Accordingly, the court ruled that the plaintiff had no viable ADA claim: "[The plaintiff] cannot perform any assembly-line job at [the employer]; what she wants is a different job, comprising a subset of the assembly-line tasks …. B[ut] the ADA does not require employers to create new positions …." *Ibid*.; *see also Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010) ("An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee. Nor is there any duty to reassign an employee to a permanent light duty position.") (citations omitted); *Delgado v. Certified Grocers Midwest, Inc.*, 282 F. App'x 457, 462 (7th Cir. 2008) ("The ADA does not require [the defendant] to create a job for Delgado or *permanently* assign him to light-duty work."); *Malabarba v. Chi. Tribune Co.*, 149 F.3d 690, 697 (7th Cir. 1998) ("Although the ADA provides that reassignment to a vacant position may constitute a reasonable accommodation, it does not require that employers convert temporary 'light-duty' jobs into permanent ones.").

Under *Watson* and the other the above-cited precedents, the CTA had no obligation to create a new position for Arce or to convert the light duty positions into permanent jobs, which is significant because the record demonstrates that Arce was never cleared, even prospectively, to return to full duty work. Because Arce could not perform the essential functions of his job even with a reasonable accommodation and because the CTA did not improperly deny him a reassignment, Arce's ADA claims fail as a matter of law.

### III.    Equal Protection Claims

Finally, Arce alleges that CTA violated the Equal Protection Clause by discriminating against him on the basis of his race, national origin, and disability.  Doc. 44 at 25-40.  As the court previously held, 2015 WL 3504860, at *7, although Arce initially brought some of these claims under 42 U.S.C. § 1981, they are properly construed as § 1983 claims because "§ 1983 remains the exclusive remedy for violations of § 1981 committed by state actors."  *Campbell v. Forest Pres. Dist.*, 752 F.3d 665, 671 (7th Cir. 2014).

"[T]he same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection claims."  *Hildebrant v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003) (alteration in original) (internal quotation marks omitted); *see also Williams v. Seniff*, 342 F.3d 774, 787-88 (7th Cir. 2003) (applying *McDonnell Douglas* to a § 1983 equal protection employment discrimination claim).  Therefore, Arce's § 1983 claims based on race and national origin discrimination fail for the same reasons as his Title VII claims.  *See Harvey v. Town of Merrillville*, 649 F.3d 526, 532 (7th Cir. 2011) ("Without a similarly situated comparator, the [plaintiffs'] equal protection claim cannot hold water."); *Hildebrant*, 347 F.3d at 1036 (holding that the plaintiff's "§ 1983 claims … can be dismissed on the same basis as the Title VII claims").

As to Arce's disability-based equal protection claim, the Supreme Court has explained:

> States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational.  They could quite hardheadedly—and perhaps hardheartedly—hold to job-qualification requirements which do not make allowance for the disabled.  If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause.

*Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367-68 (2001) (footnote omitted).  Several circuits have interpreted *Garrett* to mean that the Equal Protection Clause is an improper vehicle

25

for *any* disability-based claims. *See Ragsdell v. Reg'l Hous. Alliance*, 603 F. App'x 653, 655 (10th Cir. 2015) ("Neither the Supreme Court nor our court has ever applied the Fourteenth Amendment's Equal Protection Clause to unequal treatment based on a failure to accommodate an employee's disability. To the contrary, both courts have suggested that the Equal Protection Clause does not apply in these circumstances."); *Chick v. Cnty. of Suffolk*, 546 F. App'x 58, 60 (2d Cir. 2013) (holding that a disability discrimination claim was not cognizable under the Fourteenth Amendment). Other courts have ruled that such claims may be brought, but that state action must be upheld if rationally related to a legitimate government purpose. *See Okwu v. McKim*, 682 F.3d 841, 846 (9th Cir. 2012) (holding that the "court must affirm state disability-based employment decisions as long as the decisions are supported by a rational basis"); *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 457 (6th Cir. 2008) ("A state may … treat disabled students differently, so long as its actions are rationally related to some legitimate governmental purpose," because "[d]isabled persons are not a suspect class for purposes of an equal protection challenge"); *Toledo v. Sanchez*, 454 F.3d 24, 33-34 (1st Cir. 2006) (affirming the dismissal of equal protection disability claims because the plaintiff failed to allege that the defendant's "decisions were irrational and not motivated by any conceivable legitimate reason"). Prior to *Garrett*, the Seventh Circuit held that "[r]ational discrimination against persons with disabilities is constitutionally permissible." *Erickson v. Bd. of Governors of State Colleges & Univs. for Ne. Ill. Univ.*, 207 F.3d 945, 951 (7th Cir. 2000); *see also Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 737-38 (7th Cir. 2000) ("Disabled individuals, like any class, are protected by the Equal Protection Clause of the Fourteenth Amendment. We have previously held that the level of protection afforded to this class is that of rational basis review.") (citations omitted).

Given governing precedent, Arce's disability-based equal protection claims are subject to the rational basis test. State action "survives rational basis scrutiny if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. … [A]ny rational basis will suffice, even one that was not articulated at the time the disparate treatment occurred." *Srail v. Vill. of Lisle*, 588 F.3d 940, 946-47 (7th Cir. 2009) (internal quotation marks omitted). "The burden is on the challenger to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification." *D.B. ex rel. Kurits B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) (internal quotation marks omitted).

Arce admits that the CTA discharged him due, at least in part, to the medications he was taking. Doc. 181-1 at ¶ 55. The CTA expressed reasonably legitimate public safety concerns over having an employee in a safety-sensitive position while taking narcotic pain medications. Therefore, even assuming that Arce's disability played some causal role in his termination, he has not eliminated "any reasonably conceivable state of facts that could provide a rational basis" for the termination. *Kopp*, 725 F.3d at 686. It follows that the CTA is entitled to summary judgment on his disability-based equal protection claim.

### Conclusion

For the foregoing reasons, the CTA's summary judgment motion is granted. The CTA's motion to strike Arce's errata changes to his deposition transcript, Doc. 214, is granted in part as to the two errata discussed above, and otherwise is denied as moot in part, as the other errata pertain to testimony that is not material on summary judgment. With all claims resolved, final judgment will be entered and the trial date will be stricken.

June 9, 2016

_____
United States District Judge

27