UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ISRAEL ARCE, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 102 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

After the Chicago Transit Authority ("CTA") terminated him, Israel Arce brought this suit against CTA and two of his supervisors under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the Fourteenth Amendment's Equal Protection Clause, and Illinois law. Doc. 44. The court dismissed all of Arce's claims against the two supervisors and some of his claims against the CTA, Docs. 102-103 (reported at 2015 WL 3504860 (N.D. Ill. June 2, 2015)), and then granted summary judgment on the remaining claims against the CTA, Docs. 217-218 (reported at 193 F. Supp. 3d 875 (N.D. Ill. 2016)).

CTA filed a bill of costs seeking $13,291.62. Doc. 233. Arce opposes any cost award and, in the alternative, objects to various entries in CTA's bill. Doc. 238. For the following reasons, CTA will be awarded costs, but—because several of Arce's specific objections have merit and/or met no response—the award will be reduced to $9,964.75.

Rule 54(d)(1) provides, in relevant part: "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). The Rule "creates a presumption in favor of awarding costs to

1

the prevailing party." *Myrick v. WellPoint, Inc.*, 764 F.3d 662, 666 (7th Cir. 2014); *see also Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 864 (7th Cir. 2005); *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409 (7th Cir. 1991).

Like most presumptions, this one can be overcome—including by losing parties who demonstrate indigence. "Since 1983, [the Seventh Circuit] has held that it is within the discretion of the district court to consider a plaintiff's indigency in denying costs under Rule 54(d)." *Rivera v. City of Chicago*, 469 F.3d 631, 634 (7th Cir. 2006) (internal quotation marks omitted). *Rivera* directs district courts to undertake a two-step analysis when presented with a claim of indigence:

> First, the district court must make a threshold factual finding that the losing party is incapable of paying the court-imposed costs at this time or in the future. The burden is on the losing party to provide the district court with sufficient documentation to support such a finding. This documentation should include evidence in the form of an affidavit or other documentary evidence of both income and assets, as well as a schedule of expenses. Requiring a non-prevailing party to provide information about both income/assets and expenses will ensure that district courts have clear proof of the non-prevailing party's dire financial circumstances. Moreover, it will limit any incentive for litigants of modest means to portray themselves as indigent.
>
> Second, the district court should consider the amount of costs, the good faith of the losing party, and the closeness and difficulty of the issues raised by a case when using its discretion to deny costs. No one factor is determinative, but the district court should provide an explanation for its decision to award or deny costs.

*Id.* at 635-36 (citations and internal quotation marks omitted).

Here, Arce has provided the necessary financial documentation, but the financial hardships reflected therein do not rise to the level of indigence. Arce's financial statement shows that he and his family have a monthly income of $4,266 in unspecified benefits, Doc. 238-1 at 1, or more than $50,000 per year—roughly two and a half times the federal poverty guideline for a family of three. *See* Dep't of Health and Human Servs., *Annual Update of the HHS Poverty*

2

*Guidelines*, 81 Fed. Reg. 4036 (Jan. 25, 2016). Setting aside for a moment Arce's two largest liabilities—various home repair expenses and significant credit card debt—Arce's family's financial means do not suggest indigence.

The family's modest but livable income is in equipoise with its routine monthly expenses (roughly $4,289, summing the various monthly payments Arce identifies), even when factoring in potentially transitory medical expenditures such as Arce's prescription drug and pain management regimen ($142/month) and his daughter's orthodontics ($250/month for twenty-four months). Doc. 238-1 at 1-2. Arce and his wife also own five vehicles (including two motorcycles valued at a combined $15,000), have roughly $110,000 in unencumbered equity in their home (its $169,669 market value, less $60,058 they owe), and have $5,689 in the bank. Doc. 238-1 at 1-2. That said, Arce is currently on the hook for roughly $150,000 in home renovation costs and more than $20,000 in credit card debt. Doc. 238-1 at 1-2. In all, Arce identifies $218,058 in assets and $247,390 in liabilities. Doc. 238-1 at 1. The state of affairs in which the Arce family finds itself—in debt and underwater, but getting by—is typical of America's middle class. *See* Neal Gabler, *The Secret Shame of Middle-Class Americans*, The Atlantic (May 16, 2016), http://www.theatlantic.com/magazine/archive/2016/05/my-secret-shame/476415 (setting forth statistics showing that "either a sizeable minority or a slim majority of Americans" are "on thin ice financially," unable to absorb even modest financial shocks without considerable hardship).

Arce may be in a tight financial spot right now, but the evidence he puts forward does not establish his *future* inability to pay, which is a prerequisite to any finding of indigence under *Rivera*. *See Sklyarsky v. ABM Janitorial Servs.-N. Cent., Inc.*, 494 F. App'x 619, 623 (7th Cir. 2012) ("Sklyarsky also argues that the district court should have declined to impose costs

3

because of his indigence, but that exception applies only if a losing party shows that it is incapable of paying court-imposed costs at the time of judgment *or* in the future."); *Rivera*, 469 F.3d at 636 ("To prove her indigence, Rivera was required to show not only that she was incapable of paying court-ordered costs at the time they were imposed but also that she will be incapable of paying them in the future."). Even if all of Arce's home renovation expenses stemmed from unavoidable repairs rather than voluntary remodeling—which his affidavit does not aver, Doc. 238-2 at ¶ 5 (representing that the expenses were for "repair work on or about our real property *including* repair to the residence for water damage and necessary sanitation work") (emphasis added)—once those one-time expenses are dealt with, Arce will likely have the means in the future to pay off a debt to CTA, given his assets and cash flow. That may be especially true if he returns to work—and he does not aver he cannot do so. *See Bhat v. Accenture LLP*, 473 F. App'x 504, 507 (7th Cir. 2012) (denying an indigency exception where the losing party's "two masters degrees, management experience, and continuing job search show that she is likely to be gainfully employed—and able to pay $765—in the future").

In sum, beyond the fact that he is currently unemployed and getting by on benefits, Arce offers no reason to think his circumstances will not improve in the future. He is precisely the kind of litigant that *Rivera* aimed to ferret out: a person of "modest means" incorrectly portraying himself as truly "indigent." 469 F.3d at 635. It follows that Arce has failed to carry his burden at *Rivera*'s first step. *See Johnson v. Target Corp.*, 487 F. App'x 298, 301 (7th Cir. 2012) (affirming a $2,500 cost award despite "documentation of below-poverty-line earnings" because the losing party had a job and "minimal documented monthly expenses"); *Rivera*, 469 F.3d at 636 (agreeing with decisions holding that the losing party was not indigent because her affidavit, which averred that "she had not worked for over eight months, she supported herself,

her two children and a grandchild, she had no savings, and she received supplemental security income benefits," failed to "show whether [she] is unlikely to be able to pay costs in the future"). It therefore is unnecessary to examine *Rivera*'s second step.

The court turns next to Arce's objections to specific costs CTA seeks to recoup. A court awarding costs must ask first "whether the cost imposed on the losing party is recoverable" under 28 U.S.C. § 1920 and, "if so, whether the amount assessed for that item was reasonable." *Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000). Recoverable costs include (1) "[f]ees of the clerk and marshal"; (2) fees for "transcripts necessarily obtained for use in the case"; (3) "[f]ees and disbursements for printing and witnesses"; (4) "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case"; (5) "[d]ocket fees"; and (6) "[c]ompensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services." 28 U.S.C. § 1920. "Although a district court has discretion when awarding costs, the discretion is narrowly confined because of the strong presumption created by Rule 54(d)(1) that the prevailing party will recover costs." *Contreras v. City of Chicago*, 119 F.3d 1286, 1295 (7th Cir. 1997) (internal quotation marks and citation omitted).

*Depositions*. Arce first objects that CTA seeks excessive costs-per-page for deposition transcripts, requesting up to $4.00 per page when the proper rate has been established by a general order of this court at $3.65 per page. Doc. 238 at 6; *see Pugh v. Bd. of Educ. of City of Chi.*, 2012 WL 5199629, at *3 (N.D. Ill. Oct. 12, 2012). Arce also argues that CTA should not be allowed various other costs included on its deposition invoices, including charges for "PDF formatting," "litigation package," and shipping and handling, as well as charges associated with the Larry Wall and Daniel Murphy depositions for attaching the defense's own exhibits. Doc.

5

238 at 6-7. CTA offers no response to any of these arguments, Doc. 240 at 4, thus forfeiting the points. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in [a] response … ."); *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Stollings v. Ryobi Techs., Inc.*, 2015 WL 4100479, at *1 (N.D. Ill. July 6, 2015) ("By admitting, either affirmatively or by failing to argue the point, that these costs are not recoverable, Stollings has forfeited any claim he might otherwise have had to their recovery."). The costs for deposition transcripts that CTA requests are thus re-calculated as follows:

- Ervin Feliciano: $3.65/page x 290 pages = $1,058.50
- Carmen Ronzio: $3.65/page x 161 pages = $587.65
- Anna Cobb: $3.65/page x 151 pages = $551.15
- Michelle Cragen: $3.65/page x 119 pages = $434.35
- Bill Mooney: $3.65/page x 316 pages = $1,153.40
- Timothy Carduff: $3.65/page x 215 pages = $784.75
- Larry Wall: $3.65/page x 283 pages = $1,032.95
- Daniel Murphy: $3.65/page x 126 pages = $459.90

Docs. 232-4, 232-5, 232-6, 232-8, 232-9. Arce does not challenge CTA's requests for $1,380.15 for his own deposition and $1,270.75 for his wife's. Doc. 232-1 at 1; Doc. 238 at 6-7.

Next, Arce argues that the costs that CTA seeks for the deposition of Dr. Carlos Bomey are unjustified because the only documentation of the relevant expenses is a single check made out to Bomey for $900.00. Doc. 238 at 7. In its reply, CTA asserts that the $900.00 was paid to compensate Bomey for two hours of his time spent sitting for his deposition. Doc. 240 at 4. But

CTA offers no evidence to support its assertion, and the check itself gives no indication of the reason for the payment. Doc. 232-7. CTA has not adequately justified this cost, so the court will disallow it. *See Montanez v. Simon*, 755 F.3d 547, 559 (7th Cir. 2014) ("[I]t was not the judge's responsibility to make up for the lawyers' lack of documentation."); *Harper v. City of Chi. Heights*, 223 F.3d 593, 605 (7th Cir. 2000) ("[W]hen a fee petition is vague or inadequately documented, a district court may … strike the problematic entries … .").

Accordingly, the total amount Arce must pay CTA for deposition transcripts is $8,713.55.

*Court Filings*. With respect to copies of court filings, "the district court has discretion to determine which copies were necessary." *Montanez*, 755 F.3d at 558. Arce argues that various copies that CTA made were unnecessary or improper. He contends that the advent of electronic filing makes the creation of paper copies unnecessary, especially when it comes to exhibits, which "generally are scanned." Doc. 238 at 8. He also specifically objects to making copies of attorney appearance filings. *Id*. at 8-9. Citing *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000), and two district court decisions, CTA counters that it is entitled to "recovery for two sets of filings—one for the court and another for counsel to maintain a complete set of documents filed at the court." Doc. 240 at 5. *Kulumani* stated, while paring down a bill for five sets of copies, that "[t]wo copies of every document filed with the court or provided to opposing counsel makes sense." 224 F.3d at 685. Attorney appearances and exhibits attached to court filings fall within the category of documents filed with the court, so those are permissible.

But CTA's itemization acknowledges that it is seeking reimbursement for "one copy kept by CTA" along with one provided to the court. Doc. 234 at 2 n.1. Although Local Rule 5.2(f) makes courtesy copies for the court a reasonably necessary expense, the extra set that CTA made

7

for itself was not "necessarily obtained" within the meaning of § 1920(4). *See McIlveen v. Stone Container Corp.*, 910 F.2d 1581, 1584 (7th Cir. 1990) (holding that § 1920(4) "does not encompass [a party's] copying of court filings for its own use"); *Hruska v. Forest Preserve Dist. of Cook Cnty.*, 2013 WL 1984476, at *2 (N.D. Ill. May 10, 2013) (holding that where "one set was provided to the court and the other set was for its own file," the latter set "was not 'necessarily obtained'"); *Nicholson v. Allstate Ins. Co.*, 2012 WL 1192077, at *2 (N.D. Ill. Apr. 10, 2012) ("The second set that Allstate made for itself was not 'necessarily obtained' within the meaning of § 1920(4), and therefore cannot be recovered."); *Perry v. City of Chicago*, 2011 WL 612342, at *2 (N.D. Ill. Feb. 15, 2011) (holding that § 1920(4) does not allow recovery for "copies made solely for the convenience of counsel"). The court therefore reduces the request for copying court filings by half, allowing costs for only one copy rather than two.

Arce also objects to the amount CTA charged for copies, noting that CTA's own receipts suggest it pays $0.15 per copy, not the $0.20 per copy its bill of costs seeks. Doc. 238 at 9. CTA offers no response on this point, and thus forfeits any argument that the full $0.20 per page was appropriate. *See Nichols*, 755 F.3d at 600; *G & S Holdings*, 697 F.3d at 538; *Stollings*, 2015 WL 4100479, at *1. In any event, $0.15 per page is a reasonable rate. *See Kaplan v. City of Chicago*, 2009 WL 1940789, at *4 (N.D. Ill. July 6, 2009) ("[C]ourts in this district have found photocopying costs between $0.10 and $0.20 per page to be reasonable."); *see also United States ex rel. Marshall v. Woodward*, 2016 WL 2755324, at *4 (N.D. Ill. May 12, 2016) (same, and approving a rate of $0.20 per page where "documents reflected sensitive national security information, and so popping down to the corner FedEx was not an option"). The court exercises its discretion to award only that amount, and therefore reduces the CTA's request for copies of court filings by $0.05 per page. The amount Arce shall pay CTA for one set of copies of court

filings is 654 pages (the sum of the page totals listed on Defendants' itemization, Doc. 233-1 at 2-4) multiplied by $0.15 per page, or a total of $98.10.

*Discovery*. Turning next to discovery copies, Arce objects to $25.25 that CTA seeks for obtaining copies of Arce's records from the Illinois Department of Human Rights ("IDHR"), on the grounds that IDHR's invoice fails to identify how many pages the file contained and inappropriately includes delivery costs. Doc. 238 at 9. Seeking copies of the prior administrative record was reasonably necessary, *see Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 455 (7th Cir. 1998), and CTA has adequately documented that IDHR charged it a reasonable per-page rate of $0.15 (for 135 pages, meaning $20.25 total), Doc. 232-11, so that will be billed to Arce. The same document shows $5.00 in delivery costs. *Ibid*. CTA does not respond to Arce's assertion that the delivery costs were improper, Doc. 240 at 5-6, so that point is forfeited. *See Nichols*, 755 F.3d at 600; *G & S Holdings*, 697 F.3d at 538; *Stollings*, 2015 WL 4100479, at *1. This line item will be reduced to $20.25.

Arce next asserts that CTA did not provide a breakdown of how it arrived at 721 pages of discovery (other than the IDHR documents) that it seeks reimbursement for copying. Doc. 238 at 9. But the production log CTA attaches *does* break down its production into Bates-labeled page ranges for each type of document produced. Doc. 232-12. So Arce's argument is baseless, and those costs are allowed. For the reasons already given, however, CTA may charge only $0.15 per page, not $0.20, and it may recover only for the copies it sent to Arce, not the copies it kept for itself. Accordingly, Arce will be billed $108.15 for the 721 pages in question (721 pages multiplied by $0.15 per page). The same reductions apply to the line items for "Answer to Plaintiff's Interrogatories" (now $2.25) and "Answer to Plaintiff's Production Requests" (now $4.35).

The remaining costs billed under discovery and certified mail total $1,876.20, all of which are the costs of certified mail to and from Arce's medical providers and the fees associated with subpoenaing and obtaining medical records. Citing *Collins v. Gorman*, 96 F.3d 1057, 1060 (7th Cir. 1996), Arce asserts that CTA should not be allowed to bill more than $65—the U.S. Marshals' fee—for the service of any subpoena. Doc. 238 at 9-10. But none of the listed expenses is actually a service-of-process fee. CTA's attached invoices show that the itemized amounts associated with each medical records subpoena reflect fees the *hospitals* charged for gathering, copying, and releasing the records in question. The court therefore declines Arce's request to cap each line item at $65.

Arce next asserts that CTA should not be allowed to recoup its costs for subpoenaing and obtaining medical records from non-parties, arguing that CTA has not adequately justified the various requests and that Arce's medical records (he does not specify which) were turned over in discovery or already in CTA's possession from a prior workers' compensation proceeding. Doc. 238 at 10. CTA responds that it was obtaining medical records from providers that Arce identified as treating physicians in his Rule 26(a)(1) disclosures, Doc. 232-44 at 4-5, and that his medical history was in issue because this was a disability discrimination case. Doc. 240 at 6. That is an adequate justification for seeking medical records.

The amounts billed are also reasonable—up to a point. Some of the copying fees appear to be well in excess of $0.15 per page, based on the invoices CTA has provided. But given that these records were exclusively in the possession of specific medical providers, it is likely that CTA had little choice but to pay the various doctors' going rates for record retrieval and delivery. Otherwise, how else could they have secured the records? That said, CTA does not address Arce's contention that at least some records were likely already in its possession, either

10

because Arce turned them over in discovery or because of the workers' compensation proceeding. Given the sheer volume of medical record requests, it seems likely that there was some redundancy, and the invoices provide no way to determine what exactly was requested from each medical provider or what the records contained. To approximate what an appropriate cost would have been for obtaining medical records, then, the court will exercise its discretion to reduce the amount sought—in this case, by 50 percent, from $1,876.20 to $938.10. *See Harper*, 223 F.3d at 605 ("[W]hen a fee petition is vague or inadequately documented, a district court may … reduce the proposed fee by a reasonable percentage."); *Thorncreek Apartments I, LLC v. Vill. of Park Forest*, 2016 WL 4503559, at *10 (N.D. Ill. Aug. 29, 2016) ("when a litigant asks for a category of costs but fails to justify the amount requested, the court may … reduce the request by a percentage"); *Trading Techs. Int'l, Inc.*, 750 F. Supp. 2d 962, 979 (N.D. Ill. 2010) (citing cases reducing costs between 25 and 50 percent where the prevailing parties failed to adequately justify costs).

The combined total for discovery costs, then, is $20.25 for records from the IDHR, plus $108.15 for miscellaneous other discovery copies, plus $6.60 for interrogatory and production request responses, plus $938.10 for obtaining medical records. That comes out to $1,073.10.

*Witness Fees*. Finally, Arce argued that witness fees are capped at $40, and that CTA's itemization improperly seeks $200 each for Larry Wall and Anna Cobb. Doc. 238 at 10. CTA offered no response on this point, thereby forfeiting it. *See Nichols*, 755 F.3d at 600; *G & S Holdings*, 697 F.3d at 538; *Stollings*, 2015 WL 4100479, at *1. The court will therefore bill Arce only $40 for each of these two witnesses, for a total of $80.00.

Summing the foregoing categories of costs ($8,713.55 + $98.10 + $1,073.10 + $80.00) yields a total of $9,964.75. CTA's bill of costs is granted in part and denied in part. The court awards CTA $9,964.75.

February 23, 2017

_____
United States District Judge